UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Anastasia Bakas, on behalf of herself and all
others similarly situated,

        Plaintiff,

Civ. No. 09-1263 (RHK/SRN)
**MEMORANDUM OPINION
AND ORDER**

v.

Ameriprise Financial Services, Inc.,
f/k/a American Express Financial Advisors
Inc., and Does 1-20,

        Defendants.

Jon E. Drucker, Law Offices of Jon E. Drucker, PC, Beverly Hills, California, Russell M. Spence, Jr., The Spence Law Firm, Minneapolis, Minnesota, for Plaintiff.

Peter W. Carter, Thomas P. Swigert, Gretchen A. Agee, Dorsey & Whitney LLP, Minneapolis, Minnesota, for Defendant Ameriprise Financial Services, Inc.

## INTRODUCTION

Plaintiff Anastasia Bakas has sued her former investment adviser,[1] Defendant Ameriprise Financial Services, Inc. ("Ameriprise"), alleging that it breached its investment-services agreements with her and violated the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (the "1940 Act"). Ameriprise now moves to compel

---

[1] Except when quoting the parties' briefs, the Court will spell the word as "adviser" rather than "advisor," as the former is preferred. See Bryan A. Garner, A Dictionary of Modern Legal Usage 33 (2d ed. 1995).

arbitration or, in the alternative, to dismiss. For the reasons set forth below, the Court will grant the Motion in part and compel arbitration of this dispute.[2]

## BACKGROUND

Ameriprise is an investment adviser registered with the Securities and Exchange Commission ("SEC"). (Compl. ¶ 26.) "Through a system of over 10,000 financial advisers, it pursues its core business of selling financial planning to the public." (Id.) It provides financial-planning services pursuant to written agreements with its clients. (Id. ¶ 30.) Under those agreements, it agrees to provide a written financial plan aligned with each client's goals and needs. (Id.) Clients pay a fee each year to receive annual updated plans from Ameriprise. (Id. ¶ 37.)

Bakas signed an investment-services agreement with Ameriprise (then known as American Express Financial Advisors) in June 2005. (Id. ¶ 45.) Pursuant to that agreement, she was to receive an initial financial plan from Ameriprise, as well as annually updated plans. She agreed to pay an initial fee of $50, as well as $300 yearly for the annual updates. (Id. ¶¶ 45-46.) In 2006 and 2007, on the anniversary of her initial investment-services agreement, she signed additional investment-services agreements containing essentially the same terms. (See Carter Aff. Exs. 2-3.)[3]

---

[2] Accordingly, the Court will not address Ameriprise's alternative arguments regarding dismissal.

[3] Although Bakas's agreements with Ameriprise are not appended to the Complaint, they are expressly referenced therein. Accordingly, the Court may consider them when ruling on the instant Motion. See, e.g., Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc., 406 F.3d 1052, 1063 n.3 (8th Cir. 2005).

Each of the investment-services agreements contains an arbitration clause; while their wording differs slightly, all three require arbitration of "[a]ny controversy or claim arising out of or relating to this contract or the breach thereof." (Carter Aff. Ex. 1 § 8; accord id. Ex. 2 § 11; id. Ex. 3 § 10.) The arbitration clauses also preclude maintaining claims against Ameriprise on a class basis. (See, e.g., Carter Aff. Ex. 1 § 8.)

Bakas alleges that: (1) she never received a financial plan from Ameriprise or an annual update, despite being charged therefor (Compl. ¶¶ 48-53); and (2) all of the Ameriprise financial advisers who handled her account "concealed from her that they had no intention of providing any of the planning services promised" (id. ¶ 54). Accordingly, she commenced the instant action on behalf of herself and a putative class of thousands of Ameriprise customers, asserting four claims: (1) breach of contract; (2) violation of the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68; (3) violation of the 1940 Act; and (4) injunctive relief.[4] Pursuant to the arbitration clauses in Bakas's investment-services agreements, Ameriprise now moves to compel arbitration.

**STANDARD OF REVIEW**

Through the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq.*, Congress has established a strong federal policy in favor of arbitration. Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987). Section 2 of the FAA provides that an arbitration clause in "a contract evidencing a transaction involving commerce . . . shall be

---

[4] The Complaint's caption also lists 20 "John Does" as Defendants, but there are no allegations in the Complaint against those unnamed individuals.

3

valid, irrevocable, and enforceable." 9 U.S.C. § 2. And Section 4 of the Act provides that a party may petition a federal district court for an order compelling arbitration of a dispute covered by an agreement to arbitrate. 9 U.S.C. § 4.

A motion to compel arbitration under the FAA involves a two-step inquiry: is there a valid agreement to arbitrate between the parties? And if so, does the dispute fall within the scope of that agreement? E.g., Pro Tech Indus., Inc. v. URS Corp., 377 F.3d 868, 871 (8th Cir. 2004). In determining whether claims come within the scope of an arbitration provision, "the district court does not reach the potential merits of any claim but construes the clause liberally, resolving any doubts in favor of arbitration and granting the motion unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." 3M Co. v. Amtex Sec., Inc., 542 F.3d 1193, 1199 (8th Cir. 2008) (internal quotation marks and citation omitted); accord, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983) (because of the strong federal policy favoring arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91 (2000) (citations omitted).

**ANALYSIS**

There is no dispute that each of Bakas's investment-services agreements contains an arbitration clause, nor any dispute that the claims in the instant action fall within the scope of those arbitration clauses. And Bakas does not argue to the contrary. On the surface, therefore, it would appear that arbitration must be compelled. See Pro Tech, 377 F.3d at 871.

However, things are not that simple. Bakas argued in her Opposition that Ameriprise is a member of the Financial Industry National Regulatory Authority ("FINRA"). Because FINRA rules prohibit arbitration of putative class actions such as this action, she asserted that she cannot be compelled to arbitrate this dispute.[5] In its Reply, Ameriprise pointed out that there exists a distinction between its activities as a broker-dealer, for which it is subject to FINRA's authority, and its activities as an investment adviser, for which it is governed only by the SEC. (See Reply at 2-5.) Because Bakas's claims arise out of services it provided only as an investment adviser, it argued that the FINRA rule precluding arbitration simply does not apply. (See id.)

The Court then granted Bakas an opportunity to address this argument in a Surreply. She has responded to Ameriprise's argument on five fronts; none is persuasive.

---

[5] In particular, the FINRA Code of Arbitration Procedure (the "FINRA Code") provides that a FINRA member "may not enforce any arbitration agreement against a member of a certified or putative class action," unless and until class certification is denied, the class is decertified, the claimant is excluded from the class by court order, or the claimant withdraws from the class. FINRA Code § 12204(d) (available at http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4110 (last visited September 2, 2009)).

*First*, Bakas argues that even if Ameriprise is subject only to SEC rules and not FINRA rules, she cannot be compelled to arbitrate because the SEC, like FINRA, also bars the compulsory arbitration of her claims. (See Surreply at 1-2.) To support that argument, she points to a 1986 SEC Opinion Letter written in response to an investment adviser's inquiry whether it could include a mandatory arbitration clause in investment-services contracts with its clients. (See Drucker Dec. Ex. 1.) The SEC answered that question in the negative, concluding that the 1940 Act created certain rights "that cannot be waived," including "the right to choose the forum, whether arbitration or adjudication, in which to seek resolution of disputes." (Id.)

Because the legal landscape has changed in the 23 years since the Opinion Letter, Bakas's reliance on it is misplaced. The Opinion Letter found support for its conclusion in the Supreme Court's decision in Wilko v. Swan, 346 U.S. 427 (1953). Wilko held that claims under the Securities Act of 1933 were not arbitrable because of the jurisdictional provisions of the statute – which provide that the federal courts have "exclusive jurisdiction over violations" thereof – and its anti-waiver provisions.

Wilko, however, was "based largely on a distrust of arbitration." Ackerberg v. Johnson, 892 F.2d 1328, 1331 (8th Cir. 1989); accord, e.g., McMahon, 482 U.S. at 228-29 ("Wilko must be understood, therefore, as holding that the plaintiff's waiver of the 'right to select the judicial forum' was unenforceable only because arbitration was judged inadequate to enforce the statutory rights created by" the Securities Act). Over time, that "distrust" slowly faded, and by 1987, it was gone entirely. That year, the Supreme Court

held that claims under the Exchange Act of 1934, which contains jurisdictional and anti-waiver provisions similar to the Securities Act, could be subject to compelled arbitration. McMahon, 482 U.S. at 233-34.

In McMahon's wake, many courts held that Wilko had been implicitly overruled. See Ackerberg, 892 F.2d at 1331. In 1989, the Supreme Court made explicit what theretofore had been implicit – it expressly overruled Wilko. Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 481, 484 (1989) (because "Wilko rested on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants, it has fallen out of step with our current strong endorsement of the federal statutes favoring" arbitration; "We now conclude that Wilko was incorrectly decided.").

As a result of the foregoing, when confronted with statutes vesting jurisdiction in federal courts for violations thereof (like the 1940 Act here), Wilko's hostility to arbitration of such claims no longer applies. Rather, the Supreme Court now recognizes that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985)). And the Court has applied this principle to claims arising under all manner of statutes containing the "right" to a judicial forum. See, e.g., Gilmer, 500 U.S. at 35 (age-

7

discrimination claims); Rodriguez de Quijas, 490 U.S. at 484 (Securities Act claims); Mitsubishi, 473 U.S. at 640 (antitrust claims).

Accordingly, this Court concludes that the 1986 Opinion Letter is not controlling because the foundation upon which it rested – Wilko – is no longer "good law." As a result, the Court determines that the Opinion Letter does not preclude compulsory arbitration of Bakas's claims.

*Second*, Bakas argues that "[t]he U.S. Supreme Court decision that the SEC cites [in the Opinion Letter], Wilko v. Swan, . . . is also binding here." (Surreply at 2.) Bakas, however, ignores that Wilko was overruled by Rodriguez De Quijas – in fact, she does not mention Rodriguez De Quijas in her Surreply, and acknowledged at oral argument that it had been "overlooked."[6] For the reasons discussed above, the Court rejects this argument.

*Third*, Bakas argues that she cannot be compelled to arbitrate because she seeks injunctive relief preventing Ameriprise from engaging in similar "improper" practices in the future, and "[n]o arbitrator can grant the equitable or injunctive relief [she] seeks." (Surreply at 3.) Yet, she cites no authority for that proposition. Certainly, nothing in the arbitration clauses limits the arbitrator's authority to grant broad injunctive or equitable relief to her.[7]

---

[6] See Fed. R. Civ. P. 11(b)(2).

[7] At oral argument, Bakas asserted (again without citation) that the rules of the American Arbitration Association ("AAA") – which, under the investment-services agreements, is the entity charged with handling the arbitration – preclude an award of injunctive relief. This is

Moreover, the Supreme Court rejected a similar argument in Gilmer. There, the plaintiff had argued before the Fourth Circuit Court of Appeals that arbitration of his ADEA claim was improper because "arbitrators lack the power to issue injunctive relief to prevent employers from engaging in future acts of discrimination." Gilmer v. Interstate/Johnson Lane Corp., 895 F.2d 195, 199 (4th Cir. 1990). That Court rejected this argument, noting that arbitrators "enjoy broad equitable powers" and that "[t]hey may grant whatever remedy is necessary to right the wrongs within their jurisdiction." Id.

> Regardless, the Court of Appeals recognized that
>
> any lack of congruence which may exist between the remedial powers of a court and those of an arbitrator is hardly fatal to arbitration. So long as arbitrators possess the equitable power to redress individual claims of discrimination, there is no reason to reject their role in the resolution of ADEA disputes. That arbitrators may lack the full breadth of equitable discretion possessed by courts to go beyond the relief accorded individual victims does not deny the utility of this alternative means of resolving disputes. In enacting the FAA and the ADEA, Congress must have been aware of the respective spheres of judicial and arbitral authority and it expresses no intention that the latter be displaced.

Id. (citation omitted). The Supreme Court expressly adopted this reasoning, see 500 U.S. at 32, and this Court perceives no reason to deviate from it here.[8]

---

simply not so. See Rule 43, AAA Commercial Arbitration Rules and Mediation Procedures (available at http://www.adr.org/sp.asp?id=22440#R43 (last visited September 2, 2009)) ("The arbitrator may grant *any remedy or relief that the arbitrator deems just and equitable . . .*, including, but not limited to, specific performance of a contract.") (emphasis added).

[8] Gilmer also lays to rest Bakas's concern that an arbitrator cannot provide relief on a class-wide basis. See 895 F.2d at 199 ("That arbitrators may lack the full breadth of equitable discretion possessed by courts to go beyond the relief accorded individual victims does not deny the utility of this alternative means of resolving disputes.").

*Fourth*, Bakas argues that Ameriprise is wrong in asserting that it acted merely as an investment adviser in connection with her claims and, hence, the FINRA rule precluding arbitration does not apply. She contends that "[w]hen Ameriprise advisors sit with clients to sell plans, they are also wearing Ameriprise's broker/dealer hat." (Surreply at 3.) She points out that her investment-services agreements contemplate that Ameriprise financial advisers might buy or sell securities on her behalf and receive compensation for doing so. (Id. at 4.) Hence, "when Ameriprise advisors sell financial plans, they act as both investment advisors and broker/dealers who sell products." (Id. (emphasis deleted).)

This assertion, however, flies in the face of the language of the investment-services agreements, which do not contain any binding purchase/sale obligations on the part of Ameriprise or Bakas. Rather, they provide that "[y]our financial adviser may *recommend* that you purchase or sell investments and enter into other financial transactions," and then, in the very next sentence, provide that "*[y]ou will have no obligation to follow any such recommendations*." (Carter Aff. Ex. 3, § 7 (emphases added).) As these provisions make clear, Ameriprise could provide financial advice to a client without ever buying or selling a security on her behalf. The Court therefore rejects Bakas's contention that Ameriprise necessarily acts in a dual capacity when providing investment advice.

More importantly, Bakas's argument overlooks the nature of the claims asserted in the Complaint, which in no way concern the purchase or sale of securities. Rather, they allege only that Ameriprise failed to provide Bakas (and the other class members she

purports to represent) with financial plans – a failure arising solely out of Ameriprise's role as an investment adviser. Such claims, therefore, are not subject to FINRA rules. See Wachovia Bank, Nat'l Ass'n v. Schmidt, 445 F.3d 762, 768 (4th Cir. 2006) (noting that plaintiff's claims arose solely out of adviser-advisee relationship between investment adviser and plaintiff, even though adviser also served as lender to plaintiff; "Wachovia's two roles as lender and adviser were distinct.").

*Fifth*, and finally, Bakas argues that the FINRA rule precluding arbitration applies even if Ameriprise were acting only as an investment adviser and not a broker/dealer, because the rule applies "to FINRA '*members*'; it is not limited to their *status* as *broker/dealers*." (Surreply at 5 (emphases in original).)

Bakas is correct that the rule states that a FINRA "*member* may not enforce any arbitration agreement against a member of a certified or putative class action." FINRA Code § 12204(d) (available at http://finra.complinet.com/en/display/display_main.html? rbid=2403&element_id=4110 (last visited September 2, 2009)) (emphasis added). But FINRA's rules define the term "member" as "any *broker or dealer* admitted to membership in FINRA." See id. § 12100(r) (available at http://finra.complinet.com/en/ display/display_main.html?rbid=2403&element_id=4099 (last visited September 2, 2009)) (emphasis added). Hence, it is clear that the rules refer to the activities of a broker/dealer, not an investment adviser, when precluding arbitration by a "member." The Eighth Circuit has recognized this distinction. See Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc., 264 F.3d 770, 772 (8th Cir. 2001) (noting that member of NASD

11

(FINRA's predecessor) "did not, by virtue of its membership in NASD, agree to arbitrate this . . . dispute over fees for giving financial advice apart from brokerage services").

Moreover, this Court does not believe that a broker/dealer that also happens to be an investment adviser necessarily subjects itself to FINRA's rules for *all* of its activities – including those undertaken in its capacity as an investment adviser – simply by joining FINRA. Such a conclusion would stretch FINRA's power beyond its limits, as it enjoys no statutory authority over investment advisers. See Testimony by Stephen Luparello, Interim CEO of FINRA, before House Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises (Apr. 4, 2009) (available at http://www.mondovisione.com/index.cfm?section=news&action=detail&id=80551 (last visited September 2, 2009)) ("FINRA is not authorized to enforce compliance with the Investment Advisers Act [of 1940]. Authority to enforce that Act is granted solely to the SEC and to the states.").

The Court concludes, when read in context, that the word "member" in FINRA Code Section 12204(d) does not apply to activities undertaken by a FINRA member in an investment-adviser capacity. And because the actions Bakas challenges here occurred in that capacity only, this rule simply does not apply.[9]

---

[9] Even if there existed some doubt whether the term "member" applied to Ameriprise, the Court must resolve that doubt in favor of arbitration. Moses H. Cone, 460 U.S. at 24-25.

**CONCLUSION**

For all the reasons set forth above, the Court concludes that Bakas's claims are subject to arbitration and, hence, Ameriprise's Motion to Compel Arbitration must be granted. One final issue merits discussion, however: should the Court stay this action pending arbitration or dismiss it? Ameriprise argues that dismissal is appropriate (see Def. Mem. at 6 n.4), and Bakas has not responded to that argument.

The Court recently visited this issue in <u>Jann v. Interplastic Corp.</u>, __ F. Supp. 2d __, Civ. No. 09-721, 2009 WL 1940773, at *5 (D. Minn. July 7, 2009) (Kyle, J.), and it will not rehash that discussion here. For the reasons stated in <u>Jann</u>, the Court concludes that dismissal rather than a stay is the appropriate result. <u>See</u> <u>id.</u>

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that:

1. Ameriprise's Motion to Compel Arbitration or, in the Alternative, to Dismiss (Doc. No. 6) is **GRANTED IN PART**. To the extent the Motion seeks to compel Bakas to arbitrate her claims on an individual basis, the Motion is **GRANTED**; and

2. Plaintiff's Complaint (Doc. No. 1) is **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**[10]

Dated: September 3, 2009

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

---

[10] At oral argument, Bakas requested leave to amend her Complaint in the event the Court were inclined to grant Ameriprise's Motion. The Court **DENIES** that untimely request, as it is predicated on information available to Bakas when she filed her Complaint, and which in any event does not comply with Local Rule 15.1. See, e.g., In re Novastar Fin. Inc., Sec. Litig., __ F.3d __, 2009 WL 2747281, at *4 (8th Cir. Sept. 1, 2009) (motion for leave to amend properly denied where plaintiff requested leave only in memorandum in opposition to motion to dismiss, not via separate motion); United States ex rel. Roop v. Hypoguard USA, Inc., 559 F.3d 818, 822-23 (8th Cir. 2009) (same); Dudek v. Prudential Sec., Inc., 295 F.3d 875, 880 (8th Cir. 2002) (same); Clayton v. White Hall Sch. Dist., 778 F.2d 457, 460 (8th Cir. 1985) ("[I]n order to preserve the right to amend the complaint, a party must submit the proposed amendment along with [a] motion.").